## INVESTORS' SYNDICATE v. PORTER, Auditor.

### No. 1190.

District Court, D. Montana.

Aug. 18, 1931.

BOURQUIN, District Judge, dissenting.

Gunn, Rasch, Hall & Gunn, of Helena, Mont., Henry M. Isaacs, of Minneapolis, Minn., and A. C. Spencer, of Portland, Or., for plaintiff.

Stewart & Brown, of Helena, Mont., J. W. Freeman, of Great Falls, Mont., and L. A. Foot, Atty. Gen., for defendant.

Before SAWTELLE, Circuit Judge, and BOURQUIN and PRAY, District Judges.

PRAY, District Judge.

This is a suit in equity brought by plaintiff against defendant as auditor and ex officio investment commissioner of the state of Montana seeking injunctive relief against threatened cancellation of a permit to do business in this state, regularly issued by the latter to the former under the Blue Sky Law.

Plaintiff was incorporated under the laws of Minnesota in 1894 and authorized to engage in the business of selling certain investment certificates in that state and elsewhere; it has been so engaged in business in the state of Montana continuously since January,

1930, under such permit. According to the terms of the investment certificate, payment in a certain sum to the holder thereof is to be made at the expiration of the time stated therein, providing the holder makes the required payments during a certain period of years. The form of certificate was approved by the investment commissioner. Section 4036 of the Revised Codes of Montana 1921, authorizing the issuance of the permit, reads as follows:

"It shall be the duty of the investment commissioner to examine the statements and documents so filed, and if said investment commissioner shall deem it advisable, he shall make or have made a detailed examination, audit or investigation of such investment company's affairs; providing, that such investment company may at its option, in writing, refuse to have such investigation made, in which event said investment commissioner shall reject its application. If he finds that such investment company is solvent, that its articles of incorporation or association, its constitution and by-laws, its proposed plan of business, and proposed contracts contain and provide for a fair, just, and equitable plan for the transaction of business, and in his judgment promises a fair return on the stocks, bonds, or other securities by it offered for sale, the investment commission shall issue to such investment company a statement, entitling it to sell such securities in the state of Montana, and reciting that such company has complied with the provisions of this act, that detailed information in regard to the company and its securities is on file in the investment commissioner's office, and that such investment company is permitted to do business in this state; and such statement shall also recite in bold type that the investment commissioner in nowise recommends the securities to be offered for sale by such investment company. Such permit, however, shall be subject to revocation at any time by the investment commissioner for cause to him sufficient. But if said investment commissioner finds that such articles of incorporation or association, charter, constitution, and by-laws, plan of business, or proposed contract contain any provision that is unfair, unjust, inequitable, or oppressive to any class of contributors, or if he decides from his investigation or examination of its affairs that said investment company is not solvent, or does not intend to do a fair and honest business, or in his judgment does not promise a fair return on the stocks, bonds, or other securities by it offered for sale, then he shall not grant such company a permit as herein provided, and shall notify said company in writing of his decision."

June 22, 1931, the investment commissioner issued an order, addressed to this plaintiff, and other investment companies doing business in Montana, which is as follows:

"It is therefore ordered that from and after the 22nd day of July, 1931, the following rule shall be in full force and effect: In the interests of the investing public, any investment company operating in the State of Montana, shall not issue, sell or distribute, any bonds, certificate of indebtedness, collateral trust certificates or any other device whatsoever, that might be deemed a security creating a debtor-creditor relationship, which has a withdrawal privilege, before maturity, that does not provide for withdrawal of installments paid thereon due any time after the first year, if the owner or holder shall have given ninety (90) days notice in writing of his intention to make such withdrawal and such owner or holder shall be entitled to receive the total amount of all installments paid in, less only a withdrawal penalty not exceeding three and one-half (3½) per cent of the matured or face value of such securities, plus interest compounded annually, at the rate at which said securities are guaranteed to mature or represented to pay at maturity; and provided further, that the bond or contract representing such security and the application for the same shall have printed thereon, the amount paid in, the withdrawal or surrender value thereof, and the loan value at the end of each year of its duration.

"It is further provided that none of the above securities as enumerated shall be permitted to be sold in the State of Montana unless there is a withdrawal privilege provided each year beginning with the first year until maturity.

"Dated at Helena, Montana, this 22nd day of June, 1931.

"Geo. P. Porter.

"State Auditor and ex officio Investment Commissioner."

That the foregoing order is based upon a certain preamble or so-called "Findings" of the investment commissioner in the following language:

"1. The Commissioner maintains that section 4043 of the Revised Codes of Montana, 1921, confers authority for the promulgation of the proposed rule in the following language: ' * * * The investment commis-

sioner shall have general supervision and control, as provided by this act, over any and all investment companies and stock-brokers, domestic or foreign, licensed under this act.'

"2. The Commissioner believes that the provisions of section 4036, Revised Codes of Montana, 1921, providing in part: ' * * * Such permit, however, shall be subject to revocation at any time by the Investment Commissioner for cause to him sufficient,' clearly gives the Commissioner authority to cancel permits.

"3. That the above mentioned provision of law impliedly gives to the Commissioner the right to impose a lesser penalty, namely, the removal of all unfair provisions in contracts.

"4. That section 4045 of the Revised Codes of Montana, 1921, provides in part as follows: 'Revocation of permits and appointment of receiver. Whenever it shall appear to the investment commissioner that the assets of any investment company doing business in this state are impaired to the extent that such assets do not equal its liabilities, or that it is conducting its business in an unsafe, inequitable, or unauthorized manner, or is jeopardizing the interests of its stockholders or the investors in stocks, bonds, or other securities by it offered for sale, or whenever any investment company shall refuse to file any papers, statements, or documents required under this act, or shall refuse to permit an examination by said investment commissioner, or his deputies or agents, as provided in this act, without giving satisfactory reasons therefor, said investment commissioner shall at once cancel its permit. * * *' The Commissioner believes that a loading charge of from 5% to 8% is highly inequitable as this term is defined in this section.

"5. That it is unreasonable and inequitable to maintain that investment companies who were operating in Montana prior to the enactment of the present investment act should not be amenable to the same reasonable and lawful supervision and control by this Commissioner as exercised on companies coming under his supervision at a later date.

"6. That this Commissioner is continually receiving complaints to the effect that agents of investment companies misrepresent to prospective purchasers either by not stating the provisions relating to withdrawals or by alleging that investors can procure their money at any time.

"7. That in justice to the investing public, during the period of depression, they should not be unreasonably penalized for conditions beyond their control, caused by unemployment or depreciation of commodity values.

"8. That the proposed rule is a reasonable one as evidenced by its adoption by certain of the investment companies operating in this state and by testimony produced at the hearing.

"9. That a maximum withdrawal penalty of 3½% is amply sufficient in case of forfeiture of investment installment contracts and that withdrawals should be permissible at any time after one year."

Plaintiff filed an annual statement for 1930 showing assets in excess of $5,000,000, paid the required fee, and furnished such information to the investment commissioner as was required by him, and otherwise seems to have complied with the law. By the bill it appears that plaintiff has 20 agents in Montana duly licensed by the defendent to sell said certificates; that in 1930 plaintiff sold in Montana certificates of the maturity value of $2,141,200, to approximately 4,500 persons; that its right to do business in this state is of a value largely in excess of $3,000; and that, if it is compelled to comply with such order, it will result in unjust and unfair discrimination between present and future holders of such certificates, and disrupt and destroy plaintiff's business and compel it to retire from the state.

The principal contentions of plaintiff are that section 4036, Revised Codes of Montana 1921, which authorizes the revocation of a permit "at any time by the investment commissioner for cause to him sufficient," and the provision of section 4045, which authorizes the cancellation of a permit whenever it appears to the investment commissioner that the permittee is conducting its business in an inequitable manner, are in violation of the due process of law clause of the Fourteenth Amendment to the Constitution of the United States for failure to provide for notice and opportunity for hearing; and for the further reason that no rule or standard is fixed for determining what is a sufficient cause or when the business is being conducted in an inequitable manner.

■ No question that plaintiff is a person within the meaning of the due process of law clause of the Fourteenth Amendment, and that its right under the permit to do business in this state is property and entitled to pro-

tection when subjected to control of a state law in conflict therewith. Liggett Co. v. Baldridge, 278 U. S. 105, 49 S. Ct. 57, 73 L. Ed. 204. And that the right to enter into the contract approved by the investment commissioner, and concerning which the permit to do business was issued, is likewise protected under the Fourteenth Amendment. Tyson & Bro. v. Banton, 273 U. S. 418, 47 S. Ct. 426, 71 L. Ed. 718, 58 A. L. R. 1236.

■ Although in this case a hearing was in fact accorded plaintiff, the Blue Sky Law itself, which was relied upon by the investment commissioner, makes no provision for notice or opportunity to be heard. "If the statute did not provide for a notice in any form, it is not material that as a matter of grace or favor notice may have been given of the proposed assessment. It is not what notice, uncalled for by the statute, the taxpayer may have received in a particular case that is material, but the question is whether any notice is provided for by the statute." Coe v. Armour Fertilizer Works, 237 U. S. 413, 35 S. Ct. 625, 629, 59 L. Ed. 1027, citing Stuart v. Palmer, 74 N. Y. 183, 188, 30 Am. Rep. 289, involving the validity of a statute assessing the expense of a local improvement upon the land benefited without notice to the owner. According to the weight of authority, although the owner may have been given notice and even a hearing, indicating a desire for fair play on the part of the officer, that is not sufficient to satisfy the constitutional requirement, unless the right to such notice and hearing is embodied in the statute. National Automobile Corporation v. Barfod, 289 Pa. 307, 137 A. 601; Garfield v. U. S. ex rel. Goldsby, 211 U. S. 249, 29 S. Ct. 62, 53 L. Ed. 168; C., M. & St. P. Ry. Co. v. Board of Railroad Commissioners, 76 Mont. 305, 247 P. 162. Counsel for defendant admit that the original act in question "did not provide specifically for notice to the company by the investment Commissioner on revocation of permits, and no appeal was given to the courts in such cases. The act was open to serious question as to its due process provisions." They now claim, in view of the amendments to section 4038 as contained in chapter 194 of the Laws of 1931 (section 3), that the language of the original act has been changed to allow recourse to the courts. Defendant then quotes the original act as follows: "An appeal may be taken from the decision of the investment commissioner refusing to grant a license to any investment company or stock-broker, to the state board of examiners of this state. Such appeal shall be taken by filing with said state board of examiners an application for a hearing on its case."

The amendment was then quoted as follows: "Any interested person, who has appeared, copartnership, association or corporation being dissatisfied with any finding, findings or decision of the Commissioner made in accordance with the provisions of this Act, may within thirty days from the making thereof, commence an action in any court of competent jurisdiction against said Commissioner as defendant, to vacate and set aside said finding, findings or decsion, on the ground that the said findings or decision are unjust or unreasonable. The rules of pleading and procedure in such action shall be the same as are provided by law for the trial of equitable actions in the district courts of this state and on the hearing the judge of said court may set aside, modify or confirm said findings or decision as the evidence and the rules of equity may require."

Defendant next contends that, while it is true that due process of law is not provided for one who has not appeared before the investment commissioner, the plaintiff is not in that class, "because they have appeared and belong to a class for which due process is provided * * * and even though as to some classes the statute might be held void, it can not be held void as to plaintiff." In reply, plaintiff calls attention to a proviso, omitted by defendant, which is a part of the amendment of section 4038, and is in the following language: "Provided, however, that the original application with reference to which an appeal is herein provided for shall not be heard by the Investment Commissioner until notice of hearing on the same has been published in some newspaper published at the capital city daily, in at least seven issues of such paper, and provided further, that upon such hearing on the original application, any person, co-partnership, association or corporation interested in or opposed to said application may appear."

■ On reading the original act in connection with the amendment, and especially with the proviso, it seems quite clear that recourse to the courts is not limited to an applicant whose application for a permit has been refused by the commissioner. This wording of the proviso, "Provided, however, that the original application with reference to which an appeal is herein provided for shall not be heard by the Investment Commissioner until notice of hearing on the same has been published * * *", evidently does not mean

that the specific and comprehensive terms of the amendment proper are to be limited by this proviso to a dissatisfied applicant for a license; that language is merely descriptive of the original application "with reference to which an appeal is herein provided," as in the instance of "any interested person, who has appeared, co-partnership, association or corporation being dissatisfied with any finding, findings or decision of the Commissioner made in accordance with the provisions of this Act. * * * "

But, notwithstanding this concession to defendant in the interpretation of the amendment, it still appears that the law itself as amended does not provide for notice or opportunity for hearing before the permit is revoked, and, furthermore, that the decision shall stand, in full force, until an action is commenced and prosecuted to judgment, when the judge "may set aside, modify or confirm said findings or decision. * * * " It would seem that the guaranty of the Fourteenth Amendment is challenged when an order is made by the commissioner based upon the statute as amended, revoking a license or permit without notice or hearing to be in effect pending the test of its validity by the court. Prendergast v. New York Tel. Co., 262 U. S. 43, 43 S. Ct. 466, 67 L. Ed. 853; Love v. Atchison, T. & S. F. Ry. Co. (C. C. A.) 185 F. 321; C., M. & St. P. R. Co. v. State of Minnesota, 134 U. S. 418, 10 S. Ct. 702, 33 L. Ed. 970.

As to the second objection that no rule or standard is provided to determine when a sufficient cause exists or when the business is being conducted in an inequitable manner, the Supreme Court held in U. S. v. L. Cohen Grocer Co., 255 U. S. 81, 41 S. Ct. 298, 300, 65 L. Ed. 516, 14 A. L. R. 1045, in passing on the constitutionality of the "Lever Act," as follows:

"The sole remaining inquiry, therefore, is the certainty or uncertainty of the text in question, that is, whether the words 'that it is hereby made unlawful for any person willfully * * * to make any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries,' constituted a fixing by Congress of an ascertainable standard of guilt and are adequate to inform persons accused of violation thereof of the nature and cause of the accusation against them. That they are not, we are of opinion, so clearly results from their mere statement as to render elaboration on the subject wholly unnecessary. Observe that the section forbids no specific or definite act. It confines the subject-matter of the investigation which it authorizes to no element essentially inhering in the transaction as to which it provides. It leaves open, therefore, the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against. In fact, we see no reason to doubt the soundness of the observation of the court below in its opinion to the effect that, to attempt to enforce the section would be the exact equivalent of an effort to carry out a statute which in terms merely penalized and punished all acts detrimental to the public interest when unjust and unreasonable in the estimation of the court and jury. And that this is not a mere abstraction, finds abundant demonstration in the cases now before us, since in the briefs in these cases the conflicting results which have arisen from the painstaking attempts of enlightened judges in seeking to carry out the statute in cases brought before them are vividly portrayed. As illustrative of this situation we append in the margin a statement from one of the briefs on the subject. And again, this condition would be additionally obvious if we stopped to recur to the persistent efforts which, the records disclose, were made by administrative officers, doubtless inspired by a zealous effort to discharge their duty, to establish a standard of their own to be used as a basis to render the section possible of execution."

It would seem that the acts threatened by the investment commissioner would deprive plaintiff of his property without due process of law on either ground alleged. In the instant case, the officer is required to exercise legislative power when he sets up a standard and undertakes to say when a business is being conducted in an inequitable manner. Suppose he were directed by the statute to determine when the price of a commodity charged was unreasonable or excessive, or when it was not necessary to provide a reasonable profit, with no directions or standard to go by; would it not be less complicated than to require him to determine when a business is being conducted in an inequitable manner with no standard in the law as a guide?

It seems to be generally understood that the main object of the so-called Blue Sky Laws is the prevention of fraud. The police power exercised by the Legislature does not go to the extent of regulating or prohibiting the sale of securities or making of contracts based upon the judgment of an investment

194

commissioner or board attempting to insure the public a fair profit on the investment. Nor would the law stand the test if it prohibited such dealing in securities as in the judgment of the commissioner rested upon a plan of organization or conduct of business which was not "fair." Ala. & N. O. Transp. Co. v. Doyle (D. C.) 210 F. 173. In this case a statutory three judge court held unconstitutional the Blue Sky Laws of Michigan, as violative of the due process clause of the Fourteenth Amendment. Later another law of like character was enacted in the same state which was attacked in the same manner, wherein it was declared that the purpose of the act was not the prevention of fraud but to protect the investing public against financial loss, but the Supreme Court held that the purpose of the statute was to protect investors not from financial loss generally but from fraud. Merrick v. N. W. Halsey & Co., 242 U. S. 568, 37 S. Ct. 227, 61 L. Ed. 498.

Many authorities are cited by plaintiff to show that it is a delegation of legislative power to authorize the investment commissioner to prescribe the terms and provisions of contracts for investment companies. Section 4036, authorizing the investment commissioner to revoke a permit "for cause to him sufficient," should be considered in connection with section 4045; a cause sufficient to the commissioner must be one of the grounds provided in section 4045. The securities offered for sale had been approved by the commissioner. Conducting the business in an inequitable manner would necessarily relate to offering the securities for sale, and there is nothing in the case to show deception, misrepresentation or fraud.

In Hall v. Geiger-Jones Co., 242 U. S. 539, 37 S. Ct. 217, 220, 61 L. Ed. 480, L. R. A. 1917F, 514, Ann. Cas. 1917C, 643, involving the Blue Sky Law of Ohio, the court held: "It will be observed, therefore, that the law is a regulation of business, constrains conduct only to that end, the purpose being to protect the public against the imposition of unsubstantial schemes and the securities based upon them. Whatever prohibition there is, is a means to the same purpose, made necessary, it may be supposed, by the persistence of evil and its insidious forms and the experience of the inadequacy of penalties or other repressive measures. The name that is given to the law indicates the evil at which it is aimed; that is, to use the language of a cited case, 'speculative schemes which have no more basis than so many feet of "blue sky," ' or, as stated by counsel in

another case, 'to stop the sale of stock in fly-by-night concerns, visionary oil wells, distant gold mines, and other like fraudulent exploitations.' Even if the descriptions be regarded as rhetorical, the existence of evil is indicated, and a belief of its detriment; and we shall not pause to do more than state that the prevention of deception is within the competency of government, and that the appreciation of the consequences of it is not open for our review."

Counsel for plaintiff point to the journal of the last Legislative Assembly of Montana, giving the history of "Substitute House Bill No. 182," which failed of passage, as evidence of the intent of the Legislative Assembly that such order of the investment commissioner, here in question, should not be authorized. But it seems unnecessary to enter into discussion of questions other than those already considered.

Therefore, the court having considered the pleadings, counsel's arguments and briefs submitted, and being duly advised, it is ordered and decreed that the defendant, his employees, agents, and representatives, be, and they are hereby, enjoined from enforcing against the plaintiff herein the threatened order set forth in plaintiff's bill of complaint, and furthermore, in the opinion of the court, the law upon which the foregoing order is based, for the reasons given and to the extent herein above set forth, is violative of the due process of law clause of the Fourteenth Amendment to the Constitution of the United States, and is therefore void.

BOURQUIN, District Judge (dissenting):

The case is practically on all fours with the Hall Case, 242 U. S. 539, 37 S. Ct. 217, 61 L. Ed. 480, L. R. A. 1917F, 514, Ann. Cas. 1917C, 643; Caldwell Case, 242 U. S. 559, 37 S. Ct. 224, 61 L. Ed. 493, and Merrick Case, 242 U. S. 568, 37 S. Ct. 227, 61 L. Ed. 498.

In all are involved Blue Sky Laws alike in all material particulars; in all, like objections were made; and in all those cited the Supreme Court (8 to 1) reversed the lower tribunals and upheld the laws. Although the personnel of the court has largely changed and the "presently approved doctrine" may have likewise [See Terral's Case, 257 U. S. 533, 42 S. Ct. 188, 66 L. Ed. 352, 21 A. L. R. 186; Great Falls Case (D. C.) 39 F.(2d) 176, 177, 180], those cases are to be followed until reversed by the minority again become the majority. It is true the law in the Hall Case provides for notice before cancellation,

and this at bar does not, but that is immaterial so far as due process goes; for no hearing was allowed, and the notice was an idle gesture and sheer futility. It must be remembered that the commissioner's power to prescribe conditions and to cancel permits for breach of them is administrative, delegated by the Legislature, and partakes of legislative, rather than judicial, quality. See Louisville & N. R. Co. v. Garrett, 231 U. S. 318, 34 S. Ct. 48, 58 L. Ed. 229. He can do what the Legislature might do, his order is law as though by the Legislature made, and, as it might create conditions and cancel permits without notice and hearing (Compare National Council Case, 203 U. S. 163, 27 S. Ct. 46, 51 L. Ed. 132), so may he; in either case due process being afforded by judicial review which in itself is notice and hearing. The principle which distinguishes due process in legislative proceedings from the like in judicial proceedings is that, in the former, action followed by notice and hearing in judicial review is due process; in the latter, action must be preceded by notice and hearing to be due process. The cases more or less vaguely will be found to follow this rule.

The Minnesota Rate Case (Chicago, M. & St. P. R. Co. v. Minnesota), 134 U. S. 418, 10 S. Ct. 702, 33 L. Ed. 970, illustrates it, the court concluding that, although the statute authorized the commission without notice or hearing to fix rates, it would be valid if the state court would construe it to permit judicial review. And see Vandalia R. Co. v. Public Service Commission of Indiana, 242 U. S. 260, 37 S. Ct. 93, 61 L. Ed. 276. In any case is the right to judicial review on constitutional grounds implied if not expressed. See Plymouth Coal Co. v. Pennsylvania, 232 U. S. 547, 34 S. Ct. 359, 58 L. Ed. 713; Merrick's Case, 242 U. S. 590, 37 S. Ct. 227, 61 L. Ed. 498; Dayton, etc., Co. v. U. S., 263 U. S. 485, 486, 44 S. Ct. 169, 68 L. Ed. 388, 33 A. L. R. 472. Where property alone is involved, judicial review after action satisfies due process. See Phillips' Case, 283 U. S. 589, 51 S. Ct. 608, 75 L. Ed. 1289. And here and now plaintiff has judicial review of the order. Compare the Ben Avon Case, 253 U. S. 294, 40 S. Ct. 527, 64 L. Ed. 908. In the matter of standards, the Hall and companion cases cited are equally conclusive. See, also, Mutual Film Corp. v. Com., 236 U. S. 245, 35 S. Ct. 387, 59 L. Ed. 552, Ann. Cas. 1916C, 296; U. S. v. Grimaud, 220 U. S. 517, 31 S. Ct. 480, 55 L. Ed. 563; Union Bridge Co. v. U. S., 204 U. S. 364, 27 S. Ct. 367, 51 L. Ed. 523; U. S. v. Chicago, M. & St. P. R. Co., 282 U. S. 324, 51 S. Ct. 159, 75 L. Ed. 359.

Multitudes of commissions, federal and state, are vested with more or less power to do what Legislatures might do, to stipulate conditions and determine standards of quality, value, reasonableness, etc., for purposes of business and regulation, therein unquestioned or assailed in vain. Of course, until a standard is prescribed, it is mere conjecture, the statute binds no one, and invokes no penalties. See Cohen's Case, 255 U. S. 81, 41 S. Ct. 298, 65 L. Ed. 516, 14 A. L. R. 1045; Cline's Case, 274 U. S. 445, 47 S. Ct. 681, 71 L. Ed. 1146.

Investment companies, like banks, are clothed with sufficient public interest to warrant regulation "to stop rat holes," whether or not is "wisdom of trying to save the ignorant and rash from folly" of alluring contracts, says Mr. Justice Holmes in Dillingham's Case, 264 U. S. 372, 373, 44 S. Ct. 362, 363, 68 L. Ed. 742. The limit of regulation is reason and the state's to determine. As rates, interest, compensation, wages, and the like may be by the state prescribed, no reason is perceived why the "loading charge" (to unload?) or quasi forfeiture in plaintiff's contracts may not be.

They provide that, on payment to it of $370 annually in advance for ten years, plaintiff will return $5,000; and that the buyer may withdraw after two payments and eighteen months, receiving $210 of the $740 he has paid, the plaintiff retaining $530. Likewise, at later periods, though the return gradually increasing.

The defendant, conceiving the quasi forfeiture too great and inequitable, made the order involved that withdrawal be permitted after one year, the buyer to receive all paid, plus the guaranteed interest, less 3½ per cent. of the amount due at maturity. Thus, if the right be exercised promptly at the end of the year, of the $370 paid plus said interest, the buyer would receive $215.35, the plaintiff retaining $175. The statute authorizing defendant to determine whether the "plan" is "fair, just and equitable," and if "inequitable" to cancel permits, his finding that plaintiff's plan is inequitable, his order prescribing an equitable standard and condition, and his cancellation of permits of those who breach the condition, all are within the power of the Legislature and to defendant delegated, are reasonable, supported by sufficient legal evidence, and consistent with the guarantees of the Fourteenth Amendment.

High-pressure salesmen like hungry locusts swarm the country side, peddling so-called securities which in the indicated quality are too often comparable to a lien on a flock of wild geese. Their methods are well known. Often the very paper they sell is given some resemblance to government bonds or greenbacks. Their impressive names, the installment plan, the interest higher than paid by banks, and other alluring features, representations, hopes, and fears by the salesmen urged, made and excited, may induce ill-considered purchases by those of small means who too often soon regret or are unable to complete. Regulation to diminish their losses well might go to the full return made by banks on withdrawal. Liberty to contract is not a privilege to plunder, and in necessity yields to the police power in behalf of the general welfare. Union Dry Goods Co. v. Georgia Public Service Corp., 248 U. S. 375, 39 S. Ct. 117, 63 L. Ed. 309, 9 A. L. R. 1420; O'Gorman's Case, 282 U. S. 251, 51 S. Ct. 130, 75 L. Ed. 324.

Even existing contracts of future performance may be affected, since "the operation of reasonable laws for the protection of the public cannot be headed off by making contracts reaching into the future." Dillingham's Case, 264 U. S. 374, 44 S. Ct. 362, 364, 68 L. Ed. 742.

Regulation comes on apace or like a flooding tide. Those who kick against the pricks are opposing with weak and flimsy brooms. Even courts grow sensitive to the ground swells.

It is said that Chief Justice White admitted that "in my time we relaxed constitutional guarantees from fear of revolution," and that Chief Justice Taft declared that "at a conference I announced 'I have been appointed to reverse a few decisions,' and," with his famous chuckle, "I looked right at old man Holmes when I said it." What a pity were these illuminating incidents lost to history save in so far as the court's reports will verify them.

The trend of the age is again "liberal," however much abused the term or like charity it may cover, and we are on our way whether or not we know where we are going or what we will do when we get there. But, so far as regulation is concerned, like it or not, wise or not, it is a fair prophecy that, in classic phrase of the day, "folks, you haint seen nothin' yit."

Decree should go for defendant.