QUESTION: May a pari-mutuel wagering permittee licensed by the state lawfully sponsor, during its operating season, a sweepstakes program as heretofore defined within the confines of the physical plant wherein pari-mutuel wagering is authorized by the state?
SUMMARY: A sweepstakes program requiring selection of thoroughbred racehorse winners by a patron at a licensed pari-mutuel establishment is not a lottery prohibited by Ch. 849, F. S. The sweepstakes program is not prohibited by Ch. 550, F. S., and is subject to strict regulation by the Division of Pari-Mutuel Wagering. According to the facts submitted, the Florida thoroughbred racetracks intend to sponsor a "sweepstakes program." The program would be conducted by giving each patron, without additional charge, an entry card. The patron is instructed to select the winner of each of the nine designated races, and an alternate winner in the event of a late scratch. Only one card will be given each patron who must select the winning horse in eight of the nine races. The completed entry card is placed in an entry box prior to commencing the racing meet. The prize money is posted by the track. If there is no winner, the money is carried forward to succeeding days until a patron selects the proper number of winners. The prize money, in case of a tie, is divided equally among the winners. The racetracks are initiating the program with expectation of increasing attendance and handle. The issues raised by your question are twofold: Whether the program is a lottery prohibited by Ch. 849, F. S., and whether the program is otherwise prohibited by Ch. 550, F. S. Lotteries and the printing of lottery tickets are prohibited, with certain nonapplicable exceptions, by Ch. 849. A lottery has been judicially defined to include three elements: A prize awarded by chance for a consideration. The first element of a prize is clearly found by the awarding of prize money to the winner. The second element of consideration is present through the admission price paid by each patron. In Little River Theatre Corp. v. State ex rel. Hodge,185 So. 855 (Fla. 1939), a theatre held "bank night" at which its paid attendance was two to seven times greater than other nights. To be a winner a person merely had to register, not purchase a ticket; however, the scheme advertised the theatre, increased attendance, and increased receipts so as to constitute "consideration." See also Biennial Report of the Attorney General, 1951-1952, pp. 731 and 737; Biennial Report of the Attorney General, 1953-1954, p. 668; AGO's 055-189, 055-251, 055-389, 056-135, 058-128, 064-46, 065-25, and 065-139. Under the above authorities, it is my opinion that consideration is present in the program scheme. Consideration is provided by the admission paid by each patron receiving an entry card and the track's expected increase in attendance and handle. The third element, chance, is difficult to define and to delineate from skill. The delineation issue is not whether chance is present in determining the results but whether skill or chance is the predominant characteristic in determining the result. Chance is defined as accomplishing a result that is one in which a person's choice, will, or input has no part and will not enable the individual to know or to determine the result until it has been accomplished. Great Atlantic and Pacific Tea Co. v. Cook,240 N.E.2d 114, 118 (Ohio Misc. 1965); State ex rel. McKittrick v. Globe-Democrat Publishing Co., 110 S.W.2d 705, 713 (Mo. 1937). In AGO 051-469, Biennial Report of the Attorney General, 1950- 1951, p. 745, it was concluded that "chance" was not present when a pool hall operator awarded a prize at the end of each week to the person whose game score was higher than any other person. The element of chance in the game of pool was recognized but skill was determined to be the predominant factor in selection of the winner. See AGO's 056-315 and 058-128. The completion of a jigsaw puzzle was also found to be predominantly a game of skill in AGO 055-189. This conclusion was based on the need for the contestant's "speed, power and dexterity to rapidly reassemble the puzzle against the efforts" of other contestants. See AGO's 062-155, 064-18, and 064-46. The Florida Supreme Court has not considered the issue of whether selection of winners in horseraces is predominantly a skill; however, other jurisdictions have concluded that it is based upon skill rather than chance. Cf. Greater Loretta Imp. Ass'n v. State ex rel. Boone, 234 So.2d 665
(Fla. 1970); Lamkin v. Faircloth, 204 So.2d 747 (2 D.C.A. Fla., 1968); Pompano Horse Club v. State, 111 So. 804 (Fla. 1927). The Alabama Supreme Court most recently did so in In re Opinion of the Justices, 251 So.2d 751 (Ala. 1971) at 753: As Justice Lawson pointed out in 1947, the winner of a dog race is not determined by chance. A significant degree of skill is involved in picking the winning dog, such factors as weight, paternity, trainer, position, past record, wet or dry track, etc., all must be considered by successful bettor. The fact that the pari-mutuel system of betting is used is not determinative of the winner, but the amount of the purse. (Emphasis supplied.) An exhaustive examination of most jurisdictions is provided in Oneida County Fair Bd. v. Smylie,386 P.2d 374 (Idaho 1963), wherein the court concluded at p. 377 that the element of skill predominated in the patron's selection of race winners: They distinguish the operation of the pari-mutuel system of wagering by asserting that the player, or bettor — being furnished by the operation of the system with information concerning the breeding, training and experience of the horses, and the weight, experience and ability of the jockey — can, by exercise of his own skill and judgment, forecast, with some degree of certainty, the outcome of the race and can place his bet accordingly. See also Longstreth v. Cook, 220 S.W.2d 433 (Ark. 1949); Rohan v. Detroit Racing Ass'n, 22 N.W.2d 433 (Mich. 1943), reaching a similar conclusion. A different result was reached in Finster v. Keller, 96 Cal.Rptr. 241 (4 Ct. App. 1971), with a similar scheme that had, however, significant differing characteristics. The California scheme involved distribution of the forms to the general public at off-track locations, completion of as many forms as desired by patrons, validation of the forms as much as two days prior to the races, and completion of the forms by patrons without track attendance and without consideration of the racing factors discussed in the above quotes. Moreover, I have discussed this matter with the California racing authorities who state that a scheme similar to the one described in your request is being conducted at the Hollywood racetrack. The element of chance is always present in an activity but, based upon past opinions of this office and judicial decisions of other jurisdictions, the element of skill appears to be the predominant factor in the program. Presumably, selection of the winner will be based on an analysis of each horse's breeding, past race time, past performances, weight, jockey, trainer, and position; track conditions; and other similar factors. Thus, the program does contain elements of a prize and consideration but not the element of chance. Absent the coexistence of all three elements, a lottery prohibited by s. 849.09, F. S., is not created by the referenced program and is not violative of Ch. 849, F. S. The other issue to resolve is whether Ch. 550, F. S., prohibits operation of the program. Section 550.16 authorizes the operation of pari-mutuel pools within certain enclosures of any licensed racetrack and under the Division of Pari-Mutuel Wagering's regulatory authority. This pari-mutuel wagering is exempted by s. 849.24, F. S., from "bookmaking" prohibitions. A similar pari-mutuel exemption from betting is provided in s. 849.24. The mere payment of track admission price would not be within the purview of "betting" which is defined as the tender of something of value which will belong to one of the parties according to the outcome of a trial of chance or skill. Attorney General Opinions 065-139 and 070-19. Accordingly, I can find no statutory prohibition in Ch. 550 and conclude that the program's operation is subject to the strict regulation of the Division of Pari-Mutuel Wagering.